Marcus Daniel Merchasin, SBN 55927
Attorney and Counselor at Law
582 Market Street, Suite 1400
San Francisco, California 94104

Telephone Number: 1.415.678.2700
Facsimile Number: 1.415.520.0426
E-Mail Address: marcusmerchasin@att.net

Attorney for Pavel Semenovich Flider

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff(s),<br><br>v.<br><br>PAVEL SEMENOVICH FLIDER and TRIDENT INTERNATIONAL CORPORATION, LLC,<br><br>    Defendant(s). | CASE NUMBER: 3: 15-cr-00 154-VC-1<br><br>**APPLICATION FOR BAIL AND OPPOSITION TO GOVERNMENT'S MOTION TO DENY BAIL** |

## Introduction

This application for bail and opposition to the government's motion to deny bail[1] is being submitted on behalf of Pavel Semenovich Flider ("Flider"), who is charged with making false statements on shipping forms relating to the export of certain electronic components, and with money laundering for reinvesting the proceeds from these goods into new inventory. These alleged offenses are economic in nature, do not involve violence of any kind, and there is no evidence

---

[1] Although there does not appear to be a government motion to deny bail on record, the government did file a "Declaration of Richard J. Fitzpatrick in Support of Government's Motion to Deny Bail" (the "Declaration") (ECF 12). To the extent the Declaration constitutes a motion to deny bail, this document opposes such motion. To the extent it does not, this document constitutes Flider's application for bail.

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

that Flider is a threat to the community. Flider, a 65 year old man, has strong ties to his US-based family and to his community, meets the statutory criteria for granting release on bail, and can be expected to appear for his required court appearances.

Denying bail would impair defendant's due process rights, and would work an unreasonable hardship on him and his ability to prepare properly, with his attorneys, for trial. This case involves a vast amount of information which takes time to digest. The government itself admits that there is a massive amount of information it needs to review prior to trial. They have seized 10 terabytes of data (including about 48,000 emails), which is approximately 10 million pages of documents. If counsel were able to review 2,000 pages a day, seven days a week, it would take over 5,000 days, or 13.5 years, just to review the documents at issue, never mind interview any relevant witnesses.[2] Such an excessive pre-trial detention is unconstitutionally punitive in nature.

Pre-Trial Services recommended a bail more than sufficient to guarantee Flider's court appearances and prevent any harm to the community. This court should order his release on bail.

**Statement of Facts**

Flider emigrated to California from Russia in 1993 and became a U.S. citizen in 2000. He has lived in the San Francisco area for over 20 years. Prior to his arrest, Flider resided at 21 Eye Street in San Rafael, California, where he lives together with his wife, an 11 year old stepdaughter (who is currently completing the Fifth Grade at a public school in Sun Valley), and the elderly parents of his first wife who tragically died in automobile accident in 2003. His wife, who has had a dental practice in Russia, is currently looking to complete the necessary certification to continue her practice in California. She attends English classes daily to help her with the California Dental Boards Examinations at San Francisco

---

[2]    Flider is seeking to hire additional counsel to assist in his defense, which will be the subject of a separate motion.

1  City College, John Adams Campus. She will be at the Marin Community College

2  next semester to study English.

3       Flider also has a daughter by his first marriage, and a brother, both in the Bay

4  Area, with whom he is very close, and a sister in the Chicago area. He has strong

5  ties with the local Jewish and Russian émigré communities, many of whom support

6  this application, as per the petition that will be produced at the hearing, so much so,

7  that some of them are willing to offer their assets as security for his release from

8  jail. Flider is also involved with various local organizations. He enjoys spending

9  time with his family, playing tennis, tango dancing and gardening. He has no prior

10  criminal history (other than one or two speeding tickets), and has never been a

11  danger to anyone.

12       Flider was indicted by a grand jury in this district on March 5, 2015 for

13  allegedly violating 18 U.S.C. § 554(a),[3] 18 U.S.C. § 1956(h), and 18 U.S.C.

14  § 1956(a)(2)(A). He was arrested on March 18, and has been in custody since.

15  **Legal Argument**

16       Bail prior to trial is a critical tenet of the American judicial system and has

17  been recognized at least since the passage of the Judiciary Act of 1789. See Crim.

18  Law Advocacy (2010) Chapter 5a, *Bail* § 5.07A. Two important rights fostered by

19  the availability of reasonable bail are the constitutional guarantee that the accused

20  will be afforded a fair trial in which he can assist in his defense, and the due process

21  and jury trial rights which guarantee punishment will be inflicted only after a jury

22  verdict. *United States v. Meinster*, 481 F. Supp. 1117 (S.D. Florida 1979). Mr.

23  Flider is the only person who can go through the 10 million pages of documents

24  and know what they are really about, and he is the only person to be able to explain

25  away the innuendo and speculation raised by suspicious government agents. He

26  needs the freedom to do this or he will not have his effective day in court.

27

28  [3]     The indictment (ECF 1) references "18 U.S.C. § § 554(a) and 2", however it is unclear what the "2" references.

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

1  The Eighth Amendment to the U.S. Constitution unequivocally states that

2  "excessive bail shall not be required[.]" It is implicit in such a statement that a

3  reasonable bail is mandated by the Constitution; if extreme bail is prohibited,

4  confinement without bail can only be appropriate in extreme circumstances. As the

5  Ninth Circuit has noted, the "Fifth and Eighth Amendments' prohibition of

6  deprivation of liberty without due process and of excessive bail require careful

7  review of pretrial detention orders to ensure that the statutory mandate has been

8  respected." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

9  The case at bar is not an extreme circumstance, and is subject to exactly the

10 review contemplated in *Motamedi*. Flider is not accused of murder, terrorism, or

11 any other such crime. He is accused of improperly filling out export forms, and

12 reinvesting the proceeds from the transactions. This is not the type of activity that

13 justifies the government to seek a remedy that violates a right that the Eighth

14 Amendment so clearly articulates.

15 Supreme Court and Ninth Circuit rulings have made clear that, absent the

16 government being able to show extraordinary circumstances, defendants should be

17 afforded the fullest opportunity to be bailed in order to adequately prepare for their

18 own defense. "[F]ederal law has unequivocally provided that a person arrested for a

19 non-capital offense shall be admitted to bail." *Stack v. Boyle*, 342 U.S. 1, 4 (1951).

20 A "defendant facing trial should be released, rather than detained, unless there are

21 strong reasons for detaining him." *United States v. Honeyman*, 470 F.2d 473, 474

22 (9th Cir. 1972). "Doubts as to whether [bail] should be granted or denied should

23 always be resolved in favor of the defendant." *Herzog v. United States*, 75 S.Ct.

24 349, 351 (1955).

25 In response to the public fear that the community as a whole was being

26 threatened by a number of violent crimes committed by individuals on bail,

27 Congress enacted the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* (the

28 "Act"). The Act permits pretrial detention of a defendant only in circumstances

4

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

1  where there is a risk of flight, or where no assurances can be made that the

2  defendant's release is consistent with the safety of another person or the

3  community. *United States v. Williams*, 2007 WL 4365470, *3 (S.D. Cal. 2007).

4  However, the Act also manifests the spirit of the Eighth Amendment in that it

5  mandates that the defendant be afforded release under the least restrictive condition

6  (or combination of conditions) that will reasonably assure that the defendant will

7  appear at court, as required. *United States v. Motamedi, supra*, at 1405.

8        At 18 U.S.C. § 3142(g), the Act specifies the four factors that the court must

9  examine in determining whether pre-trial detention is the only appropriate course of

10  action:

11  (1) the nature and circumstances of the offense charged, including whether the

12  offense is a crime of violence, a violation of section 1591, a Federal crime of

13  terrorism, or involves a minor victim or a controlled substance, firearm, explosive,

14  or destructive device;

15  (2) the weight of the evidence against the person;

16  (3) the history and characteristics of the person, including—

17  (A) the person's character, physical and mental condition, family ties, employment,

18  financial resources, length of residence in the community, community ties, past

19  conduct, history relating to drug or alcohol abuse, criminal history, and record

20  concerning appearance at court proceedings; and

21  (B) whether, at the time of the current offense or arrest, the person was on

22  probation, on parole, or on other release pending trial, sentencing, appeal, or

23  completion of sentence for an offense under Federal, State, or local law; and

24  (4) the nature and seriousness of the danger to any person or the community that

25  would be posed by the person's release.

26        Finally, "it is the Government that bears the burden is proving that a

27  defendant poses a risk of flight and/or danger to the community that cannot be

28  mitigated through the imposition of conditions of release.  If the Government does

not meet its burden, the court's duty is to fashion appropriate conditions that permit the defendant to remain out of custody during the preparation of his or her defense, while safeguarding against flight or danger to the community." *United States v. Murrington*, 2013 WL 2443260 (N.D. Cal. 2013).

Taking into account the U.S. Constitution, the facts set forth above, and each of the Act's four factors, it is clear that the government has not met its burden, and that this bail application should be promptly granted.

### A.    Nature and Circumstances of the Offense and Weight of the Evidence

The nature and circumstances of this case - charges of a non-violent, white collar nature - weigh heavily in favor of release. As addressed above, the smuggling and money laundering charges against Flider are economic in nature. The government does not allege any crimes that allow for a presumption that no bond conditions will assure the accused's appearance, or the safety of the community. There are no violent crimes alleged here, no allegations of terrorism, no minor victims, and no controlled substances, firearms, explosives, or destructive devices. 18 U.S.C. § 3142(g)(1). Economic danger alone does not justify pre-trial detention, even in cases alleging wire fraud. *United States v. Gan*, 2013 WL 1345733, *1 (N.D. Cal. 2013).

While the maximum penalties for the crimes alleged by the government are significant, this fact alone is not enough to deny bail; Congress mandates that other factors be considered regarding an offense's "nature and circumstances." *United States v. Cuonh Cau Dang*, 2013 WL 4119426 at *2 (N.D. Cal. 2013). This is not a maximum penalty case. In cases where it is clear that a defendant does not have the means or opportunity to repeat the alleged crime, courts will weigh this factor against detention and in favor of release on restrictive conditions. *Id.* Here, Flider is currently subject to a Temporary Denial Order issued by the US Department of Commerce, 80 Fed. Reg. 16632 (2015), prohibiting him from engaging in any

export transaction. As such, he would have no means or opportunity to repeat his alleged crimes.[4]

Of the four factors considered by the court, the weight of the evidence is the least important. *United States v. Gebro,* 948 F.2d 1118, 1121 (9th Cir. 1991). Even if the government does have evidence against Flider, and even if the statute permits the court to consider the evidence of guilt, the statute neither permits, nor requires, a pre-trial determination that the defendant is guilty or innocent; the court is only to view the evidence through the lens of a likelihood that the person will fail to appear, or is a danger to the community. *United States v. Motamedi, supra,* 1408. As will be discussed below, much of the evidence that the government discusses in the Declaration by Special Agent Fitzpatrick has been seemingly misstated to appear to carry more weight than it actually does.

B.     History and Characteristics of the Defendant

Flider's history and character weigh strongly in favor bail. Courts consider the most important ties to the community to be the sort of family ties from which a court "can infer that a defendant is so deeply committed and personally attached that he cannot be driven from it by the threat of a long prison sentence." *United States v. Cuonh Cau Dang, supra,* at *4. These include such ties as the defendant has here. His history is rooted in California, a place he not only chose to emigrate to from Russia in 1993, but also one to which he brought the parents of his now-deceased first wife, and later, his current wife and step-daughter. He prefers the Bay Area to Russia as a place to live and raise a family.

In particular, as discussed, Flider has strong ties to the Bay Area, the place where he has lived for over 20 years. He has a residence that his daughter has designed, developed and had built for him. She has a local real estate development

---

[4]     While the government alleges that Flider's business generated over $69 million in revenues, even assuming, *arguendo,* that this was true, it would vastly overstate any net income that Flider may have earned, as it fails to take account of cost of goods sold or of operating expenses.

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

1 company with deep intimate ties to the community that Flider has encouraged from

2 the outset. He has a wife, step-daughter, brother, and daughter here, and a sister in

3 the Chicago area. He is very involved in his local tennis club, and also participates

4 in community organizations such as the Hebrew Free Loan Association, in

5 connection with which he has periodically guaranteed repayments of its loans to

6 needy persons. Flider is a valuable asset to his community; over 300 members of

7 which have spoken out in one form or another to this court on his behalf. His

8 stature in the community is further evidenced by the fact that so many of his non-

9 family members are willing to post their assets in order to secure his appearance.

10 These ties alone indicate that the defendant does not pose a flight risk.

11      His history also supports this application. Prior to his arrest, he was gainfully

12 employed by his company since 1997. He had never before been arrested, let alone

13 convicted of a crime. On the one or two occasions where he received traffic tickets,

14 he paid them off, in full. He has no history of mental health conditions, and no

15 history of drug or alcohol abuse. Flider does not have in his possession a valid

16 passport. Flider is originally from Belarus, not Russia. The United States has

17 frozen many of his assets. There is no reason to keep this man in jail pending trial.

18      C.    The Nature and Seriousness of the Danger to Any Person or the

19 Community

20      It is utterly implausible to believe that Flider poses any sort of risk to anyone.

21 It is the government that bears the burden to demonstrate, by clear and convincing

22 evidence, that there are no conditions or combination of conditions that the court

23 can impose to reasonably assure the safety of the community. *United States v.*

24 *Motamedi, supra,* at 1406. There is nothing here to support such an assertion, let

25 alone by clear and convincing evidence.

26      The crimes of which Flider is accused are not violent in nature. The

27 government has not offered a shred of evidence to demonstrate how this 65 year

28

old, five foot, eight inch, 172 pound man, with no prior criminal history, poses a danger to anyone. As such, this factor must strongly weigh in favor of release. To stress the point, Flider's family, friends and community have all stood behind him. As immigrants, many have offered the fruits of their life's work to guarantee his appearance. They know him, and they trust him because he is trustworthy.

### D.    Due Process Considerations

The Fifth Amendment to the United States Constitution provides that a person shall not be "deprived of life, liberty, or property, without due process of law[.]"   In complex criminal litigations, such as this, there is also a danger that a lengthy pre-trial detention can violate a defendant's right to due process. *United States v. Aileman,* 165 F.R.D. 571, 577 (N.D. Cal. 1996). Given the voluminous amount of information seized by the government when it executed the search warrants issued in this case (ten (10) terabytes), certain portions of which are in a foreign language, and the time required to review the documents, there is a high risk that Flider's continued pre-trial detention would result in a due process violation.

In determining a due process claim, courts consider three factors: "(1) the non-speculative length of expected confinement; (2) the extent to which the government (the prosecution and/or the court system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community." *Id.*

The government has expressed that it needs "ample time" to review the vast amounts of data. As discussed above, even reviewing 2,000 paages a day, it would take someone over 13.5 years to just review the documents prior to trial, let alone conduct witness interviews, and make other necessary trial preparations. Keeping Flider detained for such a lengthy period of time clearly violates the due process clause. Such detainment is punitive, rather than regulatory in nature. *Id.* Detention also makes counsel's interviews with his client exceedingly difficult.

606372600.2     APPLICATION FOR BAIL AND OPPOSITION TO GOVERNMENT'S MOTION TO DENY BAIL

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

E.    Flider Does Not Represent a Flight Risk

Despite the fact that he was initially interviewed by the government in 2004 (*see* ¶ 23 to Exhibit A of the Declaration) and has been aware of the government's potential criminal interest in him specifically since, at least, April 2013 when the government detained and ultimately seized one of his shipments, (*see* ¶¶ 33 - 35 to Exhibit A of the Declaration), Flider has made no attempt to flee the country, and the government has offered nothing beyond his family's summer vacation plans to try to demonstrate otherwise.[5] Even when the government seized one of his company's shipments, he never fled the jurisdiction, similar to the defendant in *United States v. Sanchez*. 2011 WL 744666 at *2 (C.D. Cal. 2011) (Granting bail, taking into consideration fact that defendant there did not flee even when he was aware of the threat of prosecution for several years.) There is no reason to believe that he would do so now, particularly when it would be so financially deleterious to his family and friends with whom he is so close.

Many of the aggravating factual allegations regarding flight risk made by Special Agent Fitzpatrick in the Declaration are overblown and taken out of context. As an initial matter, in ¶ 3 of the Declaration, Special Agent Fitzpatrick alleges that Flider did not disclose all of his assets to the Pre-Trial Services Agency during the initial interview, at which Special Agent Fitzpatrick was not present. In fact, Flider's failure to have disclosed assets overseas in that interview did not result from any willful concealment; rather, they resulted from the interviewer's failure to have asked the standard questions to Flider that are designed to elicit the information in question. At the interview, the interviewer failed to pose to Flider the asset-related questions on one page of the standard questionnaire.

This is not the only fact that has been misconstrued. For example, in ¶ 4, Special Agent Fitzpatrick makes much hay about a 500,000 ruble transfer. At the

---

[5]     The tickets have since been cancelled with the recognition that Flider will have to stay here to confront his problems.

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

1  time of the transfer, 500,000 rubles amounted to approximately $15,000 at the then

2  effective exchange rate of 32.6453 rubles to one dollar, and, based on current

3  exchange rates, is worth far less today.[6]  While it is true that Flider does have a pair

4  of accounts at Promsvyazbank, one is a deposit account, the other an account from

5  which debit card funds can be drawn in Russia.  That account has a $10,000

6  maximum balance and Flider and his wife generally keep $2,000 - $4,000 in the

7  account, at any one time.  The account had been kept merely as a matter of

8  convenience for when Flider and his family were visiting Russia.

9        In ¶ 5, Special Agent Fitzpatrick discusses an account in Hungary.  Flider did

10  open such an account for a real estate business associate, not himself, but has no

11  access to the funds, if any, in that account, as the company which holds the account

12  has been struck off the register in the Seychelles.  In ¶ 6, Special Agent Fitzpatrick

13  discusses an account at Sberbank that he claims Flider owns based on handwritten

14  notes found in Flider's home.  In fact, Flider has no such account at Sberbank.

15        Paragraph 9 of the Declaration discusses Flider's ownership of a small plot

16  of land (approximately a half of an acre) in Ryazan, Russia.  Special Agent

17  Fitzpatrick claims that city is a high tech manufacturing center that is home to

18  military-industrial companies and several Russian air force bases.  That assertion is

19  nothing more than a smoke-screen to have the court believe, without any supporting

20  evidence, that the fact that such industries/bases exist in Ryazan somehow makes

21  Flider involved with them just because he owns a small plot of land in the same

22  city.  That would be akin to saying someone is affiliated with the US Naval

23  Academy, just because the person owns a vacation home on the Chesapeake Bay, in

24  Annapolis, Maryland.

25        What is not explained in the Declaration is that Flider arranged to acquire

26  that land back in 1979, at a time when people in the Soviet Union were not free to

27  buy and sell land, but ownership could be passed on in a will.  Flider contracted

28
_____

[6]    As of May 13, 2015, 500,000 rubles is worth $10,175.42.

with the current resident to purchase such an interest, but the interest did not pass to him until the death of the current resident. In any event, this land only has a small old brick house on it.

Paragraph 9 also mentions that Flider owns a residence in St. Petersburg. Flider does, in fact, own an apartment in St. Petersburg, which he purchased in 1998. Flider and his wife use the apartment, from time to time, when they are visiting Russia, for example, when they are visiting with her family.

In ¶ 10, Special Agent Fitzpatrick explains how Flider is booked on a June 16, 2014 flight from San Francisco to Germany, with a follow on flight to Russia. What is not mentioned, however, is that this was intended to be nothing more nefarious than a family summer vacation in which he, his wife, and his school aged daughter booked tickets together to travel to Russia <u>and</u> back again before the start of school. Special Agent Fitzpatrick either did not understand the purpose of the trip, or omitted these facts in the Declaration.

Finally, as this court is aware, and, as noted above, Flider and his company are subject to a Temporary Denial Order on exporting issued by the Commerce Department. As such, he cannot currently engage in any export transaction subject to US jurisdiction. US exporters, particularly those involved exporting electronics components, generally screen the parties to their transactions against all denied parties, such as Flider, and cancel transactions in which they are involved. Therefore, his ability to engage in the type of criminal activity of which he is accused is significantly impaired, even if he were located abroad.

Taken in context, the facts illustrate that Flider is not a flight risk, much less a danger to the community. As such, he should be released on bail that is not excessive. Bail set at a calculation higher than an amount reasonably calculated to assure the accused will stand trial or submit to sentence if found guilty is "excessive." *Stack v. Boyle, supra, United States v. Scott*, 424 F. 3d 888 (9th Cir. 2005), *Meechaicum v. Fountain*, 696 F. 2d 790 (10th Cir. 1983), *United States v.*

*James*, 673 F. 2d 886 (1982 11th Cir.), *United States v. Beaman*, 631 F. 2d 85 (6th Cir. 1980).

### The Proposed Conditions

We propose the following combination of conditions that will address Your Honor's concerns regarding the source of the assets used to secure Flider's release, as expressed at the April 30, 2015 hearing, and assure both Flider's appearance in court, and the safety of the community:

1.    A $2,000,000 bond as recommended by the Pre-Trial Services Report, secured by the following:

a.    Julia Karastoianova of 5 Greene Pl, Lafayette, CA 94549, a Development manager in Ondot Systems, Inc. – a 2006 Honda Accord EXV6 2 door valued at $7,000 - $10,000.

b.    Mariya Rubel of 406 Michelle Ln, Daly City, CA 94015, CNA at Laguna Honda Hospital - unsecured bond of $50,000.

c.    Kirill and Natacha Deninzon of 3737 Terrace Dr. South Lake Tahoe, 96150, CA, an Uber employee and his homemaker wife - unencumbered home in Tahoe valued at $430,000.  An appraisal will be presented to the Court upon request to document the valuation.

d.    Joseph Soltanovich and Natalia Siradze of 4891 San Simeon Dr. Concord CA 94518, family friends - home valued at $490,000 with a principal balance of $332,784.  An appraisal will be presented to the Court upon request to document the valuation.

e.    Alex Furman, Head of Talent Operations and co-founder of InVitae Corporation and Marina Eybelman, Technical Coordinator at SFMOMA, of 2259 14th Ave., San Francisco, CA, $1,345,000.00 for personal residence.  An appraisal will be presented to the Court upon request to document the valuation.

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

MARCUS MERCHASIN LAW OFFICE
ATTORNEYS AT LAW
SAN FRANCISCO

1    f.    Felix and Lisa Podrobinok, of 140 Manchester Court, Apt 401, Buffalo

2 Grove, IL 60089, a residence valued at $400,000.00. An appraisal will be

3 presented to the Court upon request to document the valuation.

4    g.    Vladimir Volchegursky, of 5 Channel Drive, Redwood City, CA,

5 $1,310,000.00 for personal residence. An appraisal will be presented to the Court

6 upon request to document the valuation.

7    h.    Alla and Gennadiy Flider, of 699 36th Ave. # 203 San Francisco, CA,

8 $1,135,000.00 for personal residence. An appraisal will be presented to the Court

9 upon request to document the valuation.

10    i.    Ludmila Mjelskaia, of 3251 Sneath Lane San Bruno CA 94066, a QA

11 Engineer at Cisco Systems - Acura TSX 2009 valued at $10,000.00.

12    j.    Anna Klepikova and Pavel Flider, of 21 Eye Street, San Rafael, CA –

13 $2,100,000.00 for personal residence. An appraisal will be presented to the Court

14 upon request to document the valuation.

15    2.    Flider will reside in his home, and be proximate to the Northern

16 District of California Courthouse and Pre-Trial Services, as well as readily

17 accessible to his attorney.

18    3.    Continued surrender of Flider's passports. They are assumed to have

19 been seized by the agents in their search. Once available, they will be surrendered

20 forthwith while this case is pending.

21 **Conclusion**

22    For the forgoing reasons, this security will ensure that Flider appears to face

23 the charges in this case, and will protect the community. As such, this court should

24 grant Flider's application for release on bail.

25

26 Dated: 05/15/15

27 Marcus Daniel Merchasin
   Attorney at Law

28